IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:14-CV-206-D

BEVERLY BOSTON,                          )
                                         )
            Plaintiff,                   )
                                         )
        v.                               )          **MEMORANDUM**
                                         )        **AND RECOMMENDATION**
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
            Defendant.                   )

In this action, plaintiff Beverly Boston ("plaintiff" or, in context, "claimant") challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB") on the grounds that she is not disabled. The case is before the court on the parties' motions for judgment on the pleadings. (D.E. 18, 21). Both filed memoranda in support of their respective motions (D.E. 19, 22), and plaintiff filed a response to the Commissioner's motion (D.E. 24), to which the Commissioner filed a reply (D.E. 25). The motions were referred to the undersigned magistrate judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* D.E. 23). For the reasons set forth below, it will be recommended that plaintiff's motion be allowed, the Commissioner's motion be denied, and this case be remanded.

## I.    BACKGROUND

### A.    Case History

Plaintiff filed an application for DIB on 23 August 2011, alleging a disability onset date of 30 July 2011. Transcript of Proceedings ("Tr.") 14. The application was denied initially and

upon reconsideration, and a request for hearing was timely filed. Tr. 14. On 21 August 2013, a hearing was held before an administrative law judge ("ALJ"), at which plaintiff, plaintiff's husband, and a vocational expert ("VE") testified. Tr. 28-65. The ALJ issued a decision denying plaintiff's claim on 25 October 2013. Tr. 14-23. Plaintiff timely requested review by the Appeals Council. Tr. 10. On 27 August 2014, the Appeals Council admitted additional evidence (Tr. 232-37), but denied the request for review. Tr. 1-5. At that time, the decision of the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. Plaintiff commenced this proceeding for judicial review on 6 November 2014, pursuant to 42 U.S.C. § 405(g). (*See In Forma Pauperis* ("IFP") Mot. (D.E. 1); Order Allowing IFP Mot. (D.E. 4); Compl. (D.E. 5)).

**B.     Standards for Disability**

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," the temporal criterion being known as the duration requirement. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509 (defining duration requirement); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id*. § 423(d)(3).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R. § 404.1509], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in [20 C.F.R. pt. 404, subpt. P, app. 1] ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . . .

20 C.F.R. § 404.1520(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the analysis. *Pass*, 65 F.3d at 1203. The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy. *Id*.

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. If

a medically severe combination of impairments is found, the combined impact of those impairments must be considered throughout the disability determination process. *Id.*

## C. ALJ's Findings

Plaintiff was 52 years old on the alleged onset date of disability and 54 years old on both the date last insured, 31 December 2012, and on the date of the hearing. *See* Tr. 21 ¶ 7, 34. The ALJ found that plaintiff has at least a high school education (Tr. 22 ¶ 8) and past relevant work as a cashier/checker (Tr. 21 ¶ 6).

Applying the five-step analysis of 20 C.F.R. § 404.1520(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since the date of alleged onset of disability through her date last insured. Tr. 16 ¶ 2. At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations: seizure disorder, degenerative disc disease of the lumbar spine, obesity, residual effects of torn left rotator cuff, degenerative joint disease of the left shoulder, headaches, anxiety, residual effects of transient ischemic attack, and hypertension. Tr. 16 ¶ 3. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals any of the Listings. Tr. 16 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b)[1] subject to various limitations. Tr. 18 ¶ 5. The limitations are as follows:

> [The claimant] is limited to only occasional climbing stairs and ramps; she is limited to occasional bending, balancing, stooping, crawling, kneeling, and crouching; she can never climb ropes, ladders or scaffolds; she can frequently, but not constantly, push and/or pull with the left (non-dominant) upper extremity; she is limited to frequent, but not constant, fingering, grasping and handling with the

---

[1] *See also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "L-Light Work," http://www.oalj.dol.gov/libdot.htm (last visited 1 Feb. 2016). "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. § 404.1567.

left (non-dominant) hand; she must avoid occupations with hazardous machinery and concentrated exposure to fumes, dust, heat, moisture and pulmonary irritants; she is limited to simple, routine and repetitive tasks; she is limited to a low production occupation that requires no complex decision making, constant change or dealing with crisis situations.

Tr. 18 ¶ 5.

Based on his determination of plaintiff's RFC, the ALJ found at step four that plaintiff was unable to perform her past relevant work. Tr. 21 ¶ 6. At step five, the ALJ accepted the testimony of the VE and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of mail sorter, photofinishing counter clerk,[2] and information clerk. Tr. 22 ¶ 10. The ALJ accordingly concluded that plaintiff was not disabled from the date of the alleged onset of disability, 30 July 2011, through the date last insured, 31 December 2012. Tr. 23 ¶ 11.

### D. Standard of Review

Under 42 U.S.C. § 405(g), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison*

---

[2] In the decision, the ALJ refers to this job as "photo *copy* clerk." Tr. 22 ¶ 10 (emphasis added). However, the occupation cited by the VE in her testimony (*see* Tr. 63) and the occupation corresponding to the DOT code referenced by both the VE and the ALJ (*i.e.*, DOT No. 249.366-010) is the job of photo*finishing* clerk, or, as listed in the DOT, "Counter Clerk (Photofinishing)." DOT No. 249.366-010. The court will use the more formal term, photofinishing clerk, in this Memorandum and Recommendation.

*Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It is more than a scintilla of evidence, but somewhat less than a preponderance.  *Id.*

Where, as here, the Appeals Council considers additional evidence before denying the claimant's request for review of the ALJ's decision, "the court must 'review the record as a whole, including the [additional] evidence, in order to determine whether substantial evidence supports the Secretary's findings.'"  *Felts v. Astrue*, No. 1:11CV00054, 2012 WL 1836280, at *1 (W.D. Va. 19 May 2012) (quoting *Wilkins v. Sec'y Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)).  Remand is required if the court concludes that the Commissioner's decision is not supported by substantial evidence based on the record as supplemented by the evidence submitted at the Appeals Council level.  *Id.* at *1-2 (holding that Commissioner's decision implicitly determining claimant not to have a severe mental impairment and failing to consider the effect of any such impairment on his ability to work was not supported by substantial evidence in light of additional evidence of claimant's depression admitted by Appeals Council, and remanding case to Commissioner for further proceedings).

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence.  *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam).  In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility.  *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979).  A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion.  *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently

explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## II.    OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff asserts that the ALJ's decision should be reversed and DIB awarded or, alternatively, that the case should be remanded for a new hearing on the grounds that the ALJ improperly evaluated her credibility, her RFC, and the availability of jobs available to her in the national economy. Each ground is discussed in turn below.

## III.   ALJ'S CREDIBILITY DETERMINATION

Plaintiff contends that the ALJ erred in finding that plaintiff's allegations regarding the severity of her symptoms were not entirely credible. Tr. 21 ¶ 5. The court finds no error.

### A.    Applicable Legal Principles

An ALJ's assessment of a claimant's credibility involves a two-step process. *Craig*, 76 F.3d at 593-96; 20 C.F.R. § 404.1529(a)-(c); Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2 (2 July 1996). First, the ALJ must determine whether plaintiff's medically documented impairments could cause plaintiff's alleged symptoms. *Id.* Next, the ALJ must evaluate the extent to which the claimant's statements concerning the intensity, persistence, or functionally limiting effects of the symptoms are consistent with the objective medical evidence and the other evidence of record. *Id.; see also* 20 C.F.R. § 404.1529(c)(3) (setting out factors in addition to objective medical evidence in evaluation of a claimant's pain and other symptoms). If the ALJ does not find plaintiff's statements to be credible, the ALJ must cite "specific reasons" for that finding that are "supported by the evidence." Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2,

*4; *Jonson v. Colvin*, No. 12cv1742, 2013 WL 1314781, at *7 (W.D. Pa. 28 Mar. 2013) ("If an ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision."); *Dean v. Barnhart*, 421 F. Supp. 2d 898, 906 (D.S.C. 2006).

In *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), the Fourth Circuit held that an ALJ errs by first determining a claimant's ability to work and then using that determination to evaluate the claimant's credibility, rather than the reverse, criticizing boilerplate language often used by ALJs in their decisions. *Id.* at 639. The disputed language reads:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms *are not credible to the extent they are inconsistent with the above residual functional capacity assessment*.

*Id.* (emphasis added). The court clarified, however, that such errors are harmless if the ALJ otherwise properly analyzed the claimant's credibility. *Id.*

### B.     Analysis

Here, the ALJ made the following credibility finding:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects  of these symptoms *are not entirely credible for the reasons explained in this decision*.

Tr. 21 ¶ 5 (emphasis added). Thus, the ALJ's determination does not contain the boilerplate language at issue in *Mascio*.

Further, immediately following this determination, the ALJ provided, as required, a discussion of the medical evidence that contrasts with plaintiff's assertion that she was unable to work due to frequent seizures and back pain. He explained:

> [T]he record, which reveals some evidence of noncompliance, does not support the claimant's allegations. Further, treatment records reveal no significant worsening of the claimant's impairments during the period in question. Her treatment has been conservative and effective, and her radiologic findings have generally been mild. Thus, the record reveals that the claimant attained a baseline level of functioning despite her severe impairments.

Tr. 19 ¶ 5. Additionally, while recognizing that plaintiff's back pain "appears to be her most limiting impairment," the ALJ noted that "[p]hysical examinations routinely revealed full motor strength, normal and unassisted gait and negative straight leg raise testing" and that plaintiff's "most recent treatment records continue this trend." Tr. 19 ¶ 5. Regarding the frequency of plaintiff's seizures, the ALJ found that she "responded favorably to treatment" and that her seizures "were generally controlled when she took her medication as prescribed," but, as noted, "the record reveals some evidence of noncompliance [with treatment]." Tr. 19 ¶ 5.

Plaintiff fails to even acknowledge the foregoing language by the ALJ stating his credibility determination, much less explain how it was erroneous. Rather, she challenges the following language that appears after this statement of the ALJ's credibility determination at the end of the ALJ's discussion of his RFC determination:

> The undersigned has also considered the claimant's testimony, and other non-medical source statements, with respect to how her alleged impairments affect her ability to function daily. To the extent that the claimant alleges she cannot work within the [RFC], the undersigned finds the allegations not fully credible.

Tr. 21 ¶ 5. Again, this language is not the same as that rejected in *Mascio*, although it admittedly is similar. But even if this finding is deemed erroneous under *Mascio*, any such error was harmless pursuant to that same decision because, as discussed, the ALJ adequately explained his credibility determination and such explanation is supported by substantial evidence. The court accordingly rejects plaintiff's challenge to the ALJ's credibility determination.

## IV.    ALJ'S RFC DETERMINATION

### A.    Function-by-Function Analysis

In determining a claimant's RFC, Social Security Ruling 96-8p, 1996 WL 374184 (2 July 1996) requires the ALJ to perform a function-by-function analysis. The ruling states that the "RFC assessment must . . . assess [the individual's] work-related abilities on a function-by-function basis." *Id.* at *1. However, in *Mascio*, the Fourth Circuit declined to adopt a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis. *Mascio*, 780 F.3d at 636. Rather, "remand may be appropriate where the ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, while plaintiff makes specific challenges to the ALJ's functional analysis, she also appears to make the contention that the ALJ failed across the board to perform the requisite function-by-function analysis in determining her RFC. (*See* Pl.'s Mem. 3). This unsupported, general contention is unconvincing. The ALJ clearly did address specific functions in his extended review of the medical and other evidence underlying his RFC determination. *See* Tr. 18-21 ¶ 5.

The court accordingly rejects this apparent blanket contention by plaintiff. This ruling does not, of course, resolve the more specific challenges plaintiff raises to the ALJ's analysis of plaintiff's functionality, which are addressed below.

### B.    Plaintiff's Difficulties in Concentration, Persistence, or Pace

In *Mascio*, the Fourth Circuit held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to

simple, routine tasks or unskilled work.'" *Mascio*, 780 F.3d at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The court reasoned:

> [T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace.

*Id.* The court recognized that a claimant's limitation in concentration, persistence, or pace may not translate into a limitation in the RFC, but held that the ALJ must explain if that is the case. *Id.*

Here, the ALJ found that plaintiff had moderate difficulties in concentration, persistence, or pace," on the ground that her "combination of impairments could reasonably lead to substantial levels of pain that may render concentration and sustained focus difficult." Tr. 17 ¶ 4. Plaintiff contends that, in contravention of *Mascio*, the ALJ failed to account for these difficulties in his RFC determination. The court disagrees.

The ALJ addressed these difficulties in the RFC not only by limiting her to SRRTs, but also to "a low production occupation that requires no complex decision making, constant change or dealing with crisis situations." Tr. 18 ¶ 5. Other courts in this circuit have held that limitations relating directly to concentration and sustained focus together with a limitation to SRRTs are sufficient to account for a claimant's moderate difficulties in these areas in accordance with *Mascio*. *See Weeks v. Colvin*, No. 5:14-CV-155-D, 2015 WL 5242927, at *2 (E.D.N.C. 8 Sept. 2015) (limitation to "[SRRTs] with only occasional contact with the general public in an environment with few workplace changes . . . sufficiently accounted for [claimant's] difficulties with concentration and persistence"); *Linares v. Colvin*, No. 5:14-CV-120, 2015 WL 4389533, at *4 (W.D.N.C. 17 July 2015) (ALJ "accounted for [claimant's] moderate limitation in concentration and persistence by restricting her to a stable work environment with only

occasional public contact" while also including a limitation to SRRTs); *see also Ford v. Colvin*, No. 4:14-CV-79-D, 2015 WL 5008962, at *3 (E.D.N.C. 19 Aug. 2015) (ALJ accounted for claimant's difficulty with persistence and concentration through limitations to "no constant change" and "no loud noises," respectively, in addition to limiting claimant to no complex decision making). Additionally, because the ALJ determined that plaintiff's back pain was the cause of her difficulty with attention and concentration, these limitations were further accounted for by the significant exertional limitations included in the RFC.

The court concludes that the ALJ adequately accounted in his RFC determination for the difficulties in concentration and sustained focus he found plaintiff to have. The court accordingly rejects plaintiff's challenge to this aspect of the ALJ's RFC determination.

### C. Plaintiff's Ability to Work a Full Workday

Plaintiff summarily asserts that, in determining her RFC, the ALJ failed to properly consider whether plaintiff could perform full-time work on a regular basis. Under Social Security Ruling 96-8p, however, a claimant's RFC signifies an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," and "'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *2 (2 July 1996). Thus, "[a]s defined, any assessment of a claimant's RFC is necessarily an assessment of the claimant's ability to work a forty-hour work week." *Ricks v. Comm'r of Soc. Sec.*, No. 2:09cv622, 2010 WL 6621693, at *14 (E.D. Va. 29 Dec. 2010), *rep. & recomm. adopted by* 11 Feb. 2011 Order (D.E. 16). Light work also assumes the ability to work an eight-hour workday. *See, e.g.,* Soc. Sec. Ruling 83-10, 1983 WL 31251, at *6 ("[T]he full range of light work requires standing or walking, off and on, *for a total of approximately 6 hours of an 8-hour workday.*"

(emphasis added)). Therefore, by not specifying otherwise, the ALJ's decision indicates his determination that plaintiff could perform work "8 hours a day, for 5 days a week, or an equivalent work schedule." Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *2; *see Ricks*, 2010 WL 6621693, at *14.

The court concludes that the ALJ properly addressed whether plaintiff could perform full-time work on a regular basis. The court accordingly rejects plaintiff's challenge to this aspect of the ALJ's RFC determination.

### D.      Plaintiff's Ability to Reach

Plaintiff contends that the ALJ's RFC determination is erroneous because it fails to include the limitation of occasional reaching with her left arm as found by state consulting examiner Richard Caswell, M.D. Tr. 395-401. Following an examination of plaintiff on 7 April 2012, Dr. Caswell found that plaintiff has a "rotator cuff tear; it is clinically evident, also seen in my examination. The claimant needs surgery, expected moderate prognosis." Tr. 400. Based on this clinical finding, Dr. Caswell determined that plaintiff has "manipulative limitations on the left side only with reaching and [she] will be able to perform this occasionally due to a left rotator cuff tear." Tr. 400. Dr. Caswell stated numerous other findings and opinions. The ALJ gave Dr. Caswell's collective opinion "great weight," on the grounds that it was "consistent with his own examination findings and the claimant's treatment records." Tr. 20 ¶ 5.

The ALJ's attribution of great weight to Dr. Caswell's opinion is consistent with the weight he assigned the only other medical opinions in the record that expressly address plaintiff's reaching limitations, which are by two nonexamining state agency consultants. Frank Virgili, M.D. found plaintiff to have no limitation in reaching on 14 December 2011 (Tr. 117), and Lillian Horne, M.D. found plaintiff limited to frequent overhead reaching due to a "[left]

shoulder rot[ator] cuff tear/tendonitis" on 20 April 2012 (Tr. 101). The ALJ gave these opinions only "good weight" on the grounds that "evidence received at the hearing level shows that the claimant is more limited than determined by [them]." Tr. 20 ¶ 5.

Other evidence of record is also consistent with limiting plaintiff to only occasional reaching with the left arm. For example, state examining consultant Marcelo R. Perez-Montes, M.D. found that plaintiff was "[p]ositive for decreased range of motion of the left shoulder secondary to pain" and difficulty with raising her left arm overhead. Tr. 358. Even state psychological examining consultant J. Thomas Stack, Ph.D. included an Axis III[3] diagnosis for "torn left rotator cuff in left arm" (Tr. 354) and recommended that plaintiff "see an orthopedist for a consult regarding the possibility of surgery, shoulder, left rotator cuff" (Tr. 355).

Despite granting great weight to Dr. Caswell's opinion, the ALJ did not include in the RFC any limitation on reaching with the left arm. Nor did he provide any explanation reconciling the great weight he gave Dr. Caswell's opinion with his omission of any corresponding limitation in his RFC determination. In the absence of a limitation in the RFC or explanation for its absence, the court cannot conduct a meaningful review of this aspect of the ALJ's decision and therefore cannot say that the RFC determination is supported by substantial evidence as to plaintiff's ability to reach with her left arm.

The fact that the ALJ erred in this aspect of his decision does not conclude the court's inquiry because the error must be harmful to warrant remand. *See Shinseki v. Sanders*, 556 U.S.

---

[3] The Fourth Edition of the *Diagnostic and Statistical Manual of Mental Disorders,* which was the current version at the time of Dr. Stack's examination on 29 November 2011, employs a multiaxial system for the clinical assessment of mental disorders, with each of five axes referring to "a different domain of information that may help the clinician plan treatment and predict outcome." Am. Psych. Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 27 (4th ed. text rev. 2000). The axes are: "Clinical Disorders/Other Conditions That May Be a Focus of Clinical Attention" (Axis I), "Personality Disorders/Mental Retardation" (Axis II), "General Medical Conditions" (Axis III), "Psychosocial and Environmental Problems" (Axis IV), and "Global Assessment of Functioning" (Axis V). *Id.* More specifically, Axis III diagnoses are "general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder." *Id.* at 29.

396, 409-10 (2009); *Garner v. Astrue*, 436 F. App'x 224, 225 n* (4th Cir. 2011). The court finds

that the error is harmful and does require remand as discussed in the section below. Specifically,

if plaintiff were limited to only occasional overreaching, there is not substantial evidence in the

record that a significant number of jobs exist in the national economy that plaintiff could

perform.

## V. ALJ'S DETERMINATION ON THE AVAILABILITY TO PLAINTIFF OF JOBS IN THE NATIONAL ECONOMY

### A. Mail Sorter and Information Clerk Occupations

If plaintiff were limited to only occasional reaching with the left arm in the RFC, two of

the three jobs that the ALJ found that plaintiff could perform, mail sorter, DOT No. 209.687-026,

and information clerk, DOT No. 237.367-018, could be precluded because they each require

frequent reaching. *See* U.S. Dep't of Labor, Employment & Training Admin., *Selected

Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*

("SCO")[4] §§ 07.05.04 (mail sorter), 07.04.04 (information clerk) (1993). Whether they are

precluded would need to be resolved by the ALJ. More specifically, courts have held that the

VE's proposal of a job that requires a frequency of reaching that a claimant cannot perform with

one of his arms creates a conflict with the DOT that the ALJ is required to resolve pursuant to

Soc. Sec. Ruling 00-4p, 2000 WL 1898704 (4 Dec. 2000).[5] *See Meyer v. Astrue*, No. 1:09-CV-

---

[4] The SCO is a supplement to the DOT that lists the specific functional requirements for specific DOT occupations. *See* Soc. Sec. Ruling 83-14, 1983 WL 31254, at *1 (1983).

[5] Soc. Sec. Ruling 00-4p states in pertinent part:

> Occupational evidence provided by a VE or VS [*i.e.*, vocational specialist] generally should be consistent with information supplied by the DOT. When there is an apparent conflict between the VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

01448-JLT, 2010 WL 3943519, at *8 (E.D. Cal. 1 Oct. 2010) (remanding where "the ALJ failed to seek a 'reasonable explanation' from the VE as to how a person restricted to occasional reaching with the left arm, could perform jobs that require the ability to reach frequently or constantly"); *Marshall v. Astrue*, No. 08CV1735-L(WMC), 2010 WL 841252, at *6 (S.D. Cal. 10 Mar. 2010) (remanding where "the ALJ's written determination provides no explanation as to how to resolve the conflict created by the [VE's] identification of potential occupations which the DOT indicates require constant or frequent reaching but is silent as to handedness when the Plaintiff has significant restrictions placed on her left extremity only"); *Dickerson v. Astrue*, No. 7:07-CV-00137, 2008 WL 2563251, at *8 (W.D. Va. 23 June 2008) (remanding where "the VE did not provide any testimony, much less a reasonable explanation, why [plaintiff] could do one of these jobs while limited to only occasional reaching with his right arm"); *Southers v. Barnhart,* Civ. Act. No. 7:06cv00119, 2006 WL 3771813, at *4 n.1 (W.D. Va. 21 Dec. 2006) (noting the Commissioner's concession that the VE improperly identified jobs that required frequent reaching where the plaintiff was limited to occasional reaching with the right arm), *rep. & recomm. adopted by* 10 Jan. 2007 Order (D.E. 21); *Hall-Grover v. Barnhart*, No. 03-239-P-C, 2004 WL 1529283, at *4 (D. Me. 30 Apr. 2004) (holding that the ALJ's step-five determination was not supported by substantial evidence where he failed to question the VE regarding an inconsistency between a job that required frequent overhead reaching and plaintiff's restriction to no repetitive reaching with the right upper extremity), *rep. & recomm. adopted by* 24 May 2004 Order (D.E. 10).

There is, of course, no determination here by the ALJ regarding the consistency with the DOT of the mail sorter and information clerk occupations with any limitation by plaintiff to only

---

Soc. Sec. Ruling 00-4p, 2000 WL 1898704, at *2.

occasional reaching.  The ALJ's determination that plaintiff can perform these occupations is therefore not supported by substantial evidence.

### B.       Photofinishing Counter Clerk Occupation

The failure of the record to adequately support the ALJ's determination on plaintiff's ability to perform the mail sorter and information clerk occupations given her reaching limitation would be harmless if the record properly supports his determination that she could perform the remaining occupation of photofinishing counter clerk.  *See, e.g.*, *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) ("The Commissioner need show only one job existing in the national economy that [a claimant] can perform."); *Prunty v. Barnhart,* No. 6:04-CV-00038, 2005 WL 1926611, at *6 (W.D. Va. 9 Aug. 2005) (concluding that the Commissioner's burden at step five was met where the VE testified that claimant could perform the job identified in a single DOT category).   Unlike the other two occupations, the photofinishing counter clerk occupation requires only occasional reaching.  SCO § 07.03.01.  However, assuming that plaintiff can perform this work, there is not substantial evidence supporting the determination that there is a significant number of jobs in this occupation in the national economy.

### 1.       Evidence on the Number of Photofinishing Counter Clerk Jobs Available in the National Economy

At the hearing, the VE testified that there are up to 1,475 photofinishing counter clerk jobs available in North Carolina and up to 152,739 in the United States.  Tr. 22 ¶ 10; 59.  If this number of jobs, which the ALJ adopted in his decision (*see* Tr. 22 ¶ 10), is accurate, it would constitute the required "significant" number under the law of this circuit.  *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (noting that 110 positions in plaintiff's region was sufficient to satisfy the "significant number" requirement).

At the hearing, plaintiff's counsel cross-examined the VE regarding the basis for the job numbers she provided. Tr. 60. The VE testified that she relied upon information provided in publications from the United States Department of Labor, Bureau of Labor Statistics ("BLS") along with the Occupational Employment Quarterly II ("OEQ").[6] Tr. 60. Plaintiff asserts that the number of jobs provided by the VE is not the number of photofinishing counter clerk jobs, but rather the number of jobs in a much broader category of jobs used by the OEQ in reporting job incidence data, which may include both jobs that plaintiff cannot perform with her RFC and part-time jobs.

It is apparently undisputed, and even conceded by the Commissioner in this case (*see* Comm'r's Mem. 10), that there is no data presently existing that shows the number of jobs available in a particular DOT category. *See Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015) ("There is no official source of number of jobs for each job classification in the [DOT] . . . ."); *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 446 (2d Cir. 2012) ("The DOT . . . just defines jobs. It does not report how many such jobs are available in the economy."); *Guiton v. Colvin*, 546 F. App'x 137, 142 (4th Cir. 2013) ("There apparently is no data, updated on a regular basis, available through either a public or private source[ ], that reports numbers of jobs by DOT code number." (internal citations and quotations omitted, alteration original)); *Taylor v. Colvin*, No. CIV.A. 14-0573, 2015 WL 3603957, at *14 (E.D. La. 5 June 2015) ("The OEQ . . . reports job numbers by census codes, not DOT codes, as specific DOT job numbers apparently do not exist."); *Vandermark v. Colvin*, No. 3:13-CV-1467 GLS/ESH, 2015 WL 1097391, at *16 (N.D.N.Y. 11 Mar. 2015) (noting that "DOT-specific job numbers simply do not exist"). As a

---

[6] The VE testified that she used the issue of the OEQ published at "the end of 2102" (Tr. 60-61), presumably referring to the issue published for the fourth quarter of 2012.

result, VEs, like the one in this case, routinely use the OEQ job incidence data as a basis for determining the number of jobs for a particular DOT occupation.

The OEQ is published by a private company, U.S. Publishing,[7] which provides quarterly job numbers based on data from employers reported by the BLS Occupational Employment Survey and data from individuals and families reported by the Census Bureau. *See* U.S. Publishing website at http://www.uspublishing.net/ references.html ("All data provided by U.S. Publishing is derived from government sources. These sources are the U.S. Department of Labor ([BLS]) and the U.S. Department of Commerce (Census Bureau).") (last visited 1 Feb. 2016). *But see Small v. Colvin*, No. 1:12-CV-236-GZS, 2013 WL 1912892, at *6 (D. Me. 30 Mar. 2013) ("The [OEQ's] estimates of numbers of DOT-specific jobs, while based on aggregate BLS data, are not BLS estimates, but rather estimates by the private publisher, U.S. Publishing."), *rep. & recomm. adopted by* 2013 WL 1912862 (8 May 2013).

The OEQ organizes job incidence data according to the occupational codes used by the Census Bureau and their corresponding Standard Occupational Classification System ("SOC") codes developed by the BLS for use by federal statistical agencies.[8] U.S. Publishing website at http://www.uspublishing.net/oeqiii_page.html (last visited 1 Feb. 2016); *see also Brault*, 683 F.3d at 446 ("[T]he OEQ does not compile data by DOT code, but rather by [Census] code . . . ."). Census codes "are broader designations than DOT codes, and a single [Census] code may comprise numerous DOT-coded occupations." *Guiton*, 546 F. App'x at 141. As noted by one court, there are "nearly 13,000 job titles in the . . . DOT, but only about 1,000 SOC titles."

_____

[7] The OEQ is not listed as one of the publications of which the SSA takes administrative notice as a source of reliable job data. *See* 20 C.F.R. § 404.1566(d).

[8] Because the OEQ employs both the Census code number and the corresponding SOC code number in organizing the job data by occupation, ALJs, VEs, and courts often use either "Census" or "SOC" when discussing the data in the OEQ. For consistency, the court will hereinafter refer to the OEQ codes collectively as "Census" codes.

*Brault*, 683 F.3d at 446.  Accordingly, the number of jobs reported by the OEQ for a single Census code does not provide the number of jobs for any specific DOT code.  *See, e.g.*, *Vandermark*, 2015 WL 1097391, at *10 (noting that "the DOT job code for small assembler was classified under Census Code 51-9199, which included 1,587 DOT job titles, small parts assembler being only one").  The VE in this case acknowledged this in her testimony stating that Census codes may include "one job, some census codes might have three jobs, some census codes might have more than that, usually."  Tr. 62.

Further, the DOT occupations included within a given Census code do not necessarily have the same skill and exertional requirements.  *Vandermark,* 2015 WL 1097391, at *12; *see also Moreau v. Colvin*, No. 1:14-CV-191-JHR, 2015 WL 1723230, at *11 (D. Me. 14 Apr. 2015) ("[T]he OEQ II numbers reflect aggregate numbers for entire [Census] code groups, which do not correspond to the specific occupations . . . and contain jobs with differing skill and exertional levels."); *Figueroa v. Comm'r of Soc. Sec.*, No. CIV.A. 13-10169-RGS, 2013 WL 6571933, at *7 (D. Mass. 12 Dec. 2013) (noting the VE's admission that the DOT codes included within a single Census code can "vary in exertional and skill level").  Here, the VE testified and the ALJ found that the photofinishing counter clerk occupation is classified as unskilled,[9] light work.  Tr. 22 ¶ 10; 59.

While it is clear that the OEQ does not provide the number of jobs in any particular DOT category, courts have consistently upheld an ALJ's reliance on a VE's proposed job numbers derived from OEQ data when the VE further adjusts the number of jobs in the broader OEQ category to a number that reflects the number of jobs for the cited DOT occupation and provides

---

[9] Specifically, the VE testified that this job has a specific vocational preparation or SVP level of 2.  Tr. 59.  An SVP level indicates "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  DOT app. C § II.  An SVP of 2 corresponds to unskilled work.  Soc. Sec. Ruling 00-4p, 2000 WL 1898704, at *3.

a reasonable basis for having done so. For example, in *Vandermark*, the court affirmed the ALJ decision where the VE had

> personally placed clients in jobs that he opined that [claimant] could perform with her residual functional capacity, although, perhaps, not all. His opinion regarding incidence of those jobs was formed in reliance on standard statistical publications, cross-referenced with practitioners' computer software, collaboration with other professional colleagues, and twice-yearly personal adjustments to take account of market factors such as unemployment. He identified those sources, and submitted to full cross-examination.

*Vandermark*, 2015 WL 1097391, at *16. The court further explained that the VE's methodology "fits within the rubric of what courts considering this issue have determined to provide a foundation for testimony rising to the level of substantial evidence." *Id*. at *17; *see also Anders v. Colvin*, No. 2:14-CV-00610-EJF, 2015 WL 5555745, at *13 (D. Utah 18 Sept. 2015) (concluding that substantial evidence supported the ALJ's finding on job numbers where, in addition to the data in the OEQ, the VE based her job numbers on other data sources as well as "her own professional experience and 'study of the jobs'"); *Taylor v. Colvin*, No. CIV.A. 14-0573, 2015 WL 3603957, at *14 (E.D. La. 5 June 2015) (affirming the ALJ's decision where "the VE quite clearly testified that the job numbers that she provided for Census Code 540 were only for light, unskilled positions, as required by the ALJ's hypothetical question, and not the other 13 positions that fell under the DOT job title which included skilled and semiskilled occupations"); *Small v. Colvin*, No. 1:12-CV-236-GZS, 2013 WL 1912892, at *8 (approving the VE's use of OEQ job incidence data where he was able to offer numbers for DOT-specific jobs based on his education, training, and experience; his knowledge that one of the subject DOT jobs was the "predominant job among three listed within [the broader OEQ code]"; and his personal observation of the number of job openings listed in the newspaper for a particular DOT job); *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 407 (D. Conn. 2012) (upholding the ALJ's decision

where the VE "utilized reliable statistical sources as well personal knowledge and experience to develop the occupational projections provided"), *aff'd*, 515 F. App'x 32 (2d Cir. 2013); *Nichols v. Astrue*, No. CIV.A. 10-11641-DPW, 2012 WL 474145, at *12 (D. Mass. 13 Feb. 2012) (affirming the ALJ's decision where the VE adjusted the number of jobs in the broader Census code to reflect the number of jobs in DOT occupations that, in her experience, would accommodate the claimant's standing/walking limitation); *Dugan v. Comm'r of Soc. Sec. Admin.*, No. 2:10-CV-231, 2011 WL 2009465, at *7 (D. Vt. 23 May 2011) (approving of the VE's opinions because they were "based on market surveys performed by vocational counselors using the standard occupational groups outlined in the DOT" and the VE "himself participated in the market surveys which formed the basis of his opinions"), *aff'd*, 501 F. App'x 24 (2d Cir. 2012).

These cases illustrate that, despite the lack of specificity of the OEQ job incidence data, it is possible for a VE to make a reasonable adjustment to reflect DOT-specific job numbers by calling on other available sources as well as professional experience. As one court explained, "The analytical structure that the Social Security Administration ["SSA"] employs to extrapolate that information—[VEs] actively interpreting job data obtained from reputable government or private industry sources—can certainly satisfy the undemanding 'substantial evidence' standard applied in Social Security cases." *Daniels v. Colvin*, No. CV 13-654 MRW, 2014 WL 794498, at *4 (C.D. Cal. 26 Feb. 2014).

However, the use of OEQ job incidence data has recently received significant scrutiny by courts. Concerns about a VE's reliance on OEQ data arise when, unlike the cases cited above, the VE fails to reasonably adjust or, as in the present case, to make any adjustment at all in the number of jobs reported by the OEQ for a Census code to reflect the number of jobs for a

specific DOT job included within that Census code. This is particularly problematic where the other DOT jobs included are not jobs that a plaintiff can perform with his assigned RFC. After surveying cases that have addressed this issue in various jurisdictions, one court concluded:

> Courts balk . . . when [VEs] provide incidence testimony based on broad occupation groupings without accounting for the fact that such groupings include more jobs tha[n] a particular claimant can perform, without adjusting those incidence numbers accordingly or when they otherwise inject meaningful uncertainty as to how adjustments are made.

*Vandermark*, 2015 WL 1097391, at *16; *see also Dorman v. Soc. Sec. Admin.*, No. 4:12-CV-40023, 2013 WL 4238315, at *8 (D. Mass. 21 May 2013) (noting that the courts that have addressed challenges to a VE's job number testimony "have distinguished cases in which the VE relied solely on raw numbers generated by a computer software program or set forth in a written publication from cases in which the VE relied on both the published numbers and the VE's own expertise"). For example, one court found the VE's job incidence testimony inadequate where she presented "job figures that bore no apparent, logical relation to the actual DOT positions as they exist in the economy," did not "refer to specific databases to generate accurate information regarding the number of jobs that Plaintiff could perform," and did not offer "proper application of her expertise to give insight to the more generalized data available to her." *Daniels*, 2014 WL 794498, at *5; *see also St. Pierre v. Astrue*, No. 1:10-cv-104-JAW, 2010 WL 5465635, at *3 (D. Me. 29 Dec. 2010) (finding the VE's testimony insufficient where he admitted that he relied only "'on published raw numbers, which pertained not to the specific DOT . . . jobs at issue but rather to *groups of jobs* of differing skill and exertional levels that happened to contain the three specific jobs'") (emphasis in original) (quoting *Clark v. Astrue*, No. 09-390-P-H, 2010 WL 2924237, at *3 (D. Me. 19 July 2010))); *Moyers v. Colvin*, No. 3:13-0959, 2015 WL 1013992, at *21 (M.D. Tenn. 9 Mar. 2015) (finding the VE's testimony "unacceptably vague" where, after

having initially provided job numbers, the VE later admitted that "'only some percentage of that number' would include the specific jobs that he had identified"), *rep. & recomm. adopted by* 2015 WL 1467178 (30 Mar. 2015); *Smith v. Astrue*, No. 1:13-CV-00366, 2014 WL 2112030, at *14 (W.D. La. 8 May 2014) (concluding that substantial evidence did not support the ALJ's decision where the VE never provided the number of jobs for a particular DOT category, but rather only "the numbers for the [Census] category that is comprised of seven different jobs"); *Marvin v. Colvin*, No. 3:12-CV-1779 GLS, 2014 WL 1293509, at *10, n.11 (N.D.N.Y. 31 Mar. 2014) (concluding that the VE's testimony did not constitute substantial evidence where she gave no indication that she "accounted for the fact that the [Census] codes . . . included more jobs than [the claimant] could actually perform, and that she adjusted the number of jobs available accordingly"); *Rosa v. Colvin,* No. 3:12-CV-0170, 2013 WL 1292145, at *9-10 (N.D.N.Y. 27 Mar. 2013) (holding that the ALJ's step-five determination was not supported by substantial evidence where the VE's testimony regarding the number of jobs available was for a broad category of jobs, which included jobs that the claimant could not perform).

One particularly questionable method employed by some VEs to adjust the OEQ job incidence numbers involves simply dividing the total number of jobs for the broader Census category by the number of DOT titles included within it. The Seventh Circuit has repeatedly criticized this method as "unacceptably crude" because "there is no basis for assuming that there are, for example, as many mophead trimmer-and-wrappers, . . . as there are fish-egg packers, . . . or poultry-dressing workers" in the broader job category of "hand-packager." *Browning v. Colvin*, 766 F.3d 702, 708, 709 (7th Cir. 2014), *reh'g denied* (28 Oct. 2014); *see also Hill v. Colvin*, 807 F.3d 862, 870 (7th Cir. 2015) (Posner, J., concurring) ("The assumption is . . . that

every narrow category has the same number of jobs as every other narrow category within the broad category—a preposterous assumption.").[10]

But in this case, there is no adjustment method for the court to consider because the VE apparently made no attempt to reduce the total number of jobs in the broader Census categories to reflect the number of jobs in the specific DOT occupations she identified.[11]  In fact, when asked by plaintiff's counsel how many DOT occupations were included in the subject Census categories, she testified, "I don't know that I have that right off the bat."  Tr. 61.  She did not provide any number later in her testimony.  Thus, despite having previously testified as to a specific number of available jobs in each of the three DOT occupations she cited (Tr. 58-59),[12] on cross-examination she admitted that she did not, in fact, know how many jobs existed in those DOT occupations (Tr. 61).

The failure to adjust the job numbers she provided to reflect the subject DOT occupations is particularly concerning because, as previously discussed, not all of the DOT occupations

---

[10] The Seventh Circuit has recently assessed the manner in which ALJs evaluate VE testimony on job incidence as "a persistent, serious, and often ignored deficiency" in ALJ decisions and noted that this deficiency "has recently been attracting critical attention."  *Hill*, 807 F.3d at 870 (citing Jon C. Dubin, *Overcoming Gridlock:  Campbell After a Quarter–Century and Bureaucratically Rational Gap–Filling in Mass Justice Adjudication in the Social Security Administration's Disability Programs*, 62 Admin. L. Rev. 937, 964-71 (2010); Peter J. Lemoine, "Crisis of Confidence:  The Inadequacies of Vocational Evidence Presented at Social Security Disability Hearings (Part II)," Social Security Forum, Sept. 2012, p. 1, available at www.lemoinelawfirm.com/wp-content/uploads /2012/seminar_materials.pdf) (last visited 1 Feb. 2016)).

[11] While the Commissioner asserts that the VE's testimony as to the job numbers was based "not only on the DOT, but on the [OEQ] and her '20 years of doing industrial rehab, working with employers, and reviewing jobs'" (Comm'r's Mem. 4), the VE did not testify that she relied on her experience in determining job numbers, but rather did so in addressing the effect of absenteeism and the need to change positions in the DOT occupations she cited. Tr. 64.

[12] Specifically, in response to the ALJ's hypothetical, the VE proposed the three DOT jobs and their corresponding occupational code numbers as follows:

> [A] light, SVP of 2 occupations as a mail sorter, a mail clerk in an office setting, 209.687.026. . . . North Carolina, 1,689. USA, 174,992.  There would also be a light, SVP of 2 of a photo counter clerk, 249.366-010.  And in North Carolina 1,475; USA 152,739.  There would also be a light, SVP of 2 of an information clerk, 237.367-018.  And, in North Carolina 1626, USA 166,532.

Tr. 58-59.

included within a Census code have the same skill or exertional level. In principle, this means that the number of jobs the VE offered could include jobs that plaintiff cannot perform under the hypothetical provided by the ALJ. In fact, this is the case.

According to the Specific Occupation Selector Manual (U.S. Publishing, 5th ed. 2.0.1 2008) ("SOS Manual"), a companion publication to the OEQ containing a crosswalk between the DOT codes and the Census/SOC codes,[13] the DOT occupation of photofinishing counter clerk is one of 24 DOT occupations included in the broader Census category of "Counter and Rental Clerks" (Census code 474; SOC code 41-2021). SOS Manual 68-69. Though the ALJ determined plaintiff to have an RFC for light work, four of the DOT occupations in the subject Census code are classified as medium work. *Id.* Further, contrary to the VE's testimony that all of the jobs included in her job numbers would have an SVP level of 2 or lower (Tr. 34), only 10 of the 24 jobs have an SVP 2, with the remaining jobs having an SVP ranging from 3 to 6. *Id.* Further, had the ALJ included the limitation of only occasional overhead reaching with the left arm in plaintiff's RFC, she could perform only 3 of the 24 jobs, as the remaining 21 jobs require at least frequent reaching. *Id.*

The court concludes that the VE's testimony does not constitute substantial evidence to support the ALJ's step-five determination on the number of photofinishing counter clerk jobs because it amounted to no more than a recitation of "raw numbers" that did not relate to the

---

[13] The publisher describes the SOS manual more specifically as follows:

[A] crosswalk with two sections. Section I is arranged numerically by Census and Standard Occupation Classification (SOC) codes. For each occupation the worker traits from the Dictionary of Occupational Titles (DOT) are also shown along with - Physical Demands - Working Conditions - G.E.D. - S.V.P. – Apptitudes [sic] - and O*Net Codes. Part II is an alphabetical index of DOT jobs showing SOC codes and Census Codes. The manual allows the user to crosswalk [from] Census to DOT / SOC codes and vice versa. The S.O.S. Manual 5th Edition is designed to be used with our other publications [such as the OEQ] . . . .

U.S. Publishing website at http://www.uspublishing.net/sample_stats.html (last visited 1 Feb. 2016).

photofinishing counter clerk occupation and encompassed occupations with exertional and skill levels plaintiff could not perform according to the ALJ's findings. *See Dorman*, 2013 WL 4238315, at *8.[14]

### 2. The Continued Existence of the Occupation of Photofinishing Counter Clerk

Notwithstanding the unreliability of the job incidence data presented by the VE for the photofinishing counter clerk job, an examination of the DOT description for this job, alone, raises serious doubts about the viability of such an occupation in the current national economy. The DOT describes this job as follows:

> 249.366-010 Counter Clerk (Photofinishing)
>
> Receives film for processing, loads film into equipment that automatically processes film for subsequent photo printing, and collects payment from customers of photofinishing establishment: Answers customer's questions regarding prices and services. Receives film to be processed from customer and enters identification data and printing instructions on service log and customer order envelope. Loads film into equipment that automatically processes film, and routes processed film for subsequent photo printing. Files processed film and photographic prints according to customer's name. Locates processed film and prints for customer. Totals charges, using cash register, collects payment, and returns prints and processed film to customer. Sells photo supplies, such as film, batteries, and flashcubes. GOE: 07.03.01 STRENGTH: L GED: R2 M2 L2 SVP: 2 DLU: 86.

DOT No. 249.366-010; *see also* Tr. 60 (VE's testimony that "[t]he photo[finishing] counter clerk, there would be using machine that would develop film"). The last update of this DOT

---

[14] While plaintiff also contends that the inclusion of part-time jobs in the OEQ incidence data, as admitted by the VE in her testimony (Tr. 63), further erodes the reliability of the VE's job numbers, the court need not address this issue because it has determined that the VE's testimony is inadequate on the other grounds discussed. However, courts have held that a VE is not necessarily required to distinguish between part-time and full-time positions when providing job numbers. *See Brault,* 683 F.3d at 450 n.6 ("We decline to create a *per se* rule prohibiting an ALJ from considering part-time positions."); *Liskowitz v. Astrue,* 559 F.3d 736, 745 (7th Cir. 2009) (holding that "a VE may . . . testify as to the number of jobs that a claimant can perform without specifically identifying the percentage of those jobs that are part-time").

description, as indicated by "DLU: 86" in the definition trailer, was in 1986, about 30 years ago.[15] DOT No. 249.366-010.

There can be no reasonable dispute that the use of film cameras, and, consequently, the need for film processing services, declined rapidly over the past 30 years with the widespread marketing of digital cameras, which have since been marginalized by the ubiquitous "smartphone" camera. *See, e.g.*, *United States v. Saboonchi*, 990 F. Supp. 2d 536, 557 (D. Md.) ("[A]s of 2012, eighteen percent of those who take digital photographs were using a smartphone as their primary camera, and that percentage has been growing as the percentage of people who use a dedicated camera for most of their photography has been falling."), *reconsid. denied,* 48 F. Supp. 3d 815 (2014). Even the United States Supreme Court has recognized that "a significant majority of American adults now own [smart phones]." *Riley v. California*, 134 S. Ct. 2473, 2484 (2014) (further commenting that "modern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy"); *see also United States v. Mathis*, No. 8:12-CR-457-T-30MAP, 2013 WL 869511, at *5 (M.D. Fla. 19 Feb. 2013) ("Cell phones, smart phones, and the marketing of these products are ubiquitous in our digital-age society."), *rep. & recomm. adopted by* 2013 WL 868250 (7 Mar. 2013), *aff'd,* 767 F.3d 1264 (11th Cir. 2014), *cert. denied* 135 S. Ct. 1448 (2015); *United States v. Clark*, 29 F. Supp. 3d 1131, 1142 (E.D. Tenn. 2014) (recognizing the "pervasive" use of smartphones).

Courts have repeatedly expressed concern about an ALJ's reliance on obviously outdated DOT occupations at step five. While the last publication of the DOT was in 1991, the last

---

[15] "DLU," which refers to the "Date of Last Update," "indicates the last year in which material was gathered for that occupation. A DLU of '77' would indicate that the occupation has not been studied by an analyst since publication of the fourth edition DOT in 1977." DOT, Appendix C: Components of the Definition Trailer, 1991 WL 688702, ¶ I.

Case 4:14-cv-00206-D    Document 26    Filed 02/02/16    Page 28 of 36

significant update of the occupation information it contains occurred with the 1977 edition. *See* Government Accountability Office ("GAO") Report 12-420, Highlight: Modernizing SSA Disability Programs (June 2012) ("SSA currently relies on occupational information developed by the Department of Labor which has not had a major update since 1977."). As noted by the Seventh Circuit in 2014, "the job descriptions used by the [SSA] come from a 23-year-old edition of the [DOT], which is no longer published, and mainly moreover from information from 1977—37 years ago." *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). The court further noted that "[n]o doubt many of the jobs have changed and some have disappeared." *Id*; *see also Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014) ("[T]he DOT . . . is . . . an obsolete catalog of jobs (most of the entries in it date back to 1977)."). The questionable current value of the information contained in the DOT has been acknowledged by the SSA itself. In 2008, it established the Occupational Information Development Advisory Panel ("OIDAP") to provide guidance on the SSA's plan "to replace the [DOT] and its companion volume, the [SCO]" with an occupational information system designed to "ensure up-to-date vocational evidence in our disability programs." Establishment of the OIDAP, 73 Fed. Reg. 78864-01 (23 Dec. 2008); *see also* GAO Report 12-420 at 14 (describing the project as "a multiyear project to research and design a new source of occupational information that will replace the outdated information currently being used to determine if claimants are able to do their past work or any other work in the national economy").

Notably, the Fourth Circuit has previously emphasized the importance of using current occupational information in SSA cases. In *English v. Shalala*, 10 F.3d 1080 (4th Cir. 1993), the court remanded a claim where the VE had testified as to jobs the claimant could perform based on the 1965 edition of the DOT instead of the then-current 1977 edition. *Id*. at 1084-85. The

court held that "[w]hen the Secretary purports to rely on information contained in the *DOT* to establish the existence or absence of jobs that can be performed by a claimant, it stands to reason that the current edition of the *DOT* should be used." *Id*. at 1085. It explained that "'[t]he differences between the Third and Fourth Editions are substantial" and "'an expert's use of [an] outdated version [is] a failure to apply the Social Security regulations as mandated.'" *Id*. (quoting *Townley v. Heckler*, 748 F.2d 109, 113, 114 (2d Cir. 1984)).

Courts have rejected an ALJ's step-five determination where the DOT occupations relied upon are, on their face, outdated or obsolete. For example, in *Feeley v. Comm'r of Soc. Sec.*, No. CIV. 14-4970 KM, 2015 WL 3505512, at *10 (D.N.J. 3 June 2015), the court took issue with the ALJ's reliance on the VE's proposal of "Telephone Quotation Clerk," DOT No. 237.367-046, a job in which an individual "[a]nswers telephone calls from customers requesting current stock quotations and provides information posted on electronic quote board. Relays calls to REGISTERED REPRESENTATIVE (financial) 250.257-018 as requested by customer. May call customers to inform them of stock quotations." DOT No. 237.367-046, 1991 WL 672194. The court explained:

> The notion of an investor calling his brokerage house on the telephone to have a stock quotation read to him by a receptionist who monitors an "electronic quote board" does seem rather quaint. I am sure that it still occurs. Nevertheless, the [VE's] testimony that in 2012 there were approximately 970,000 telephone quotation clerk jobs available nationally, and 95,000 available regionally, seems dubious.

*Feeley*, 2015 WL 3505512, at *10. The court stated that remand "might well [have been] appropriate" on this ground had it not found that the evidence supported a significant number of jobs in the two other DOT occupations offered by the VE. *Id*. at *11; *see also Alaura v. Colvin*, 797 F.3d 503, 508 (7th Cir. 2015) (remanding after finding, *inter alia*, it "hard to believe" the VE's testimony that there were an existing 200,000 jobs in the United States in the occupation of

"addresser" (DOT No. 209.587-010) which involves "[a]ddress[ing] *by hand or typewriter*, envelopes, cards, advertising literature, packages, and similar items for mailing" (emphasis added)); *Vanna Hong Vo v. Colvin*, No. EDCV 14-01105-DFM, 2015 WL 1383138, at *5 (C.D. Cal. 24 Mar. 2015) ("It strains credulity to accept the VE's testimony that there are 410,000 people nationally and 24,000 people in the region making a living by inspecting wooden dowels, or that there are 229,000 people nationally and 10,000 in the region making a living assembling perfume bottle atomizers."); *Bowles v. Colvin*, No. 3:13-CV-801-JEM, 2015 WL 1129173, at *7 (N.D. Ind. 11 Mar. 2015) (expressing concern about the ALJ's acceptance, without comment, of the VE's testimony about job incidence where "several of the jobs . . . −notably, that of microfilm document preparer−seem likely to have changed or disappeared in the 37 years given new document storage methods"); *Kane v. Colvin*, No. 2:13-CV-00131-JEM, 2014 WL 4829622, at *10 (N.D. Ind. 29 Sept. 2014) (expressing doubt, due to the shift to online publications, about the continued existence of "cutter and paster" (DOT No. 249.587-014) which involves "[t]ear[ing] or cut[ting] out marked articles or advertisements from newspapers and magazines, using knife or scissors," [r]ecord[ing] the name of publication, page and location, date, and name of customer on label, and affix[ing] label to clipping"); *Hill*, 807 F.3d at 870 (expressing concern about the insufficiency of the VE's testimony, noting that the court was "skeptical . . . about how many jobs exist today that involve maintaining library records on microfilm," but remanding on other grounds).

The lack of testimony from the VE in this case to support a finding that the job of photofinishing counter clerk remains a viable occupation in the current economy further supports the court's conclusion that the ALJ's step-five determination regarding the photofinishing counter clerk occupation is not supported by substantial evidence. *See Daniels*, 2014 WL

794498, at *5 (concluding that the VE had "offered no plausible basis from which the ALJ could conclude that roughly one-third of all people employed in the broad Counter and Rental Clerks category of jobs served as photofinishing counter clerks"). *But see Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (holding that the ALJ properly relied on the VE's testimony that sufficient photofinishing counter clerks jobs existed[16] and rejecting the plaintiff's request to take notice of a decline in the photofinishing industry based on claimant's "conclusory proclamations")). Further adding to the court's concern about the continued existence of these jobs is the lack of consistency in the national job numbers reported by VEs for this DOT occupation, which range widely from 6,700 jobs, *Wilson v. Astrue*, No. CIV.A. 10-0464, 2011 WL 1565894, at *10 (W.D. La. 3 Feb. 2011), *rep. & recomm. adopted by* 2011 WL 1560671, *1 (25 Apr. 2011), to 447,000 jobs, *Rodgers v. Astrue*, No. CIV.A. 12-00050-N, 2013 WL 588254, at *8 (S.D. Ala. 13 Feb. 2013). *See also Sullivent v. Colvin*, No. 6:14-CV-03383-MDH, 2015 WL 4948941, at *2 (W.D. Mo. 19 Aug. 2015) (30,000 jobs); *Quarles v. Colvin*, No. 1:13-CV-02521-JMC, 2014 WL 6695777, at *13 (D.S.C.) (88,000 jobs), *rep. & recomm. adopted by* 2014 WL 6695777, at *1 (25 Nov. 2014); *Daniels*, 2014 WL 794498, at *2 (176,000 jobs); *Taylor v. Astrue*, No. 11-CV-01425-CMA, 2012 WL 1520179, at *7 (D. Colo. 30 Apr. 2012) (50,600 jobs); *Jones v. Astrue*, No. EDCV08-1001-CT, 2008 WL 5351631, at *16 (C.D. Cal. 18 Dec. 2008) (27,000 jobs).

Finally, the court turns to the Commissioner's assertion that the Fourth Circuit's unpublished decision in *Guiton v. Colvin*, 546 F. App'x 137 (4th Cir. 2013) supports her assertion that the VE's job incidence testimony was sufficient. In *Guiton*, the court rejected a challenge to an ALJ's reliance on the job numbers provided by the VE for three DOT occupations where the VE admitted that the numbers were for the broader Census job category

---

[16] The court did not, however, elaborate on the nature and scope of the VE's testimony on this point.

that covered an additional 1,684 DOT occupations. *Id.* at 142-43. The basis for the court's decision was two-fold. First, the court concluded that to require the Commissioner to "produce job statistics specific to the DOT-coded occupations" would constitute an "impossible burden" because such data does not exist. *Id.* at 142. The court additionally found that because the total number of jobs provided by the VE for the three DOT occupations—26,330 jobs in North Carolina and 825,000 nationally—was substantial, it was adequate to support the ALJ's decision because "[e]ven assuming these numbers were overinclusive, far smaller figures would still suffice to satisfy the Commissioner's burden." *Id.*

Concurring in the judgment only on this second ground, Judge Davis "express[ed] [his] discomfort with the ALJ's acceptance of the [VE's] uncritical reliance on the [OEQ] to calculate the number of jobs available in the economy." *Id.* at 143. Specifically, Judge Davis pointed out that, unlike the expert in *Brault*, which was cited by the majority, "the [VE] here apparently did not adjust the OEQ's numbers to reflect what she knew existed in a particular market; rather, she apparently accepted OEQ's numbers as accurate without further inquiry." *Id.* at 145.

The court concludes that *Guiton* is not dispositive in this case for several reasons. First, because *Guiton* is an unpublished decision, it is not binding precedent. *See* 4th Cir. R. 36(a) (setting out criteria for publication of decisions), (b) ("Unpublished opinions give counsel, the parties, and the lower court or agency a statement of the reasons for the decision. They may not recite all of the facts or background of the case and may simply adopt the reasoning of the lower court."); Local Civ. R. 7.2(d), E.D.N.C. ("The unpublished decision of a United States Circuit Court of Appeals will be given due consideration and weight but will not bind this court."); *see also White v. Green Tree Servicing, LLC*, No. CIV.A. RDB-14-3295, 2015 WL 4647944, at *5 n.8 (D. Md. 4 Aug. 2015) ("Unpublished opinions are not binding precedent in the Fourth

Circuit.") (citing 4th Cir. R. 32.1). Further, the concerns raised by Judge Davis in his concurring opinion, which are reflected in the case law described above, give the court pause in applying the *Guiton* holding in this case. Moreover, unlike *Guiton*, the court's determination in this case is not based solely on the VE's wholesale reliance on the OEQ job numbers, but also on the questionable viability of the job of photofinishing counter clerk in the current economy.

For the foregoing reasons, the court concludes that the Commissioner failed to show by substantial evidence that there is a significant number of jobs in the national economy in the photofinishing counter clerk occupation available to plaintiff. In light of the court's prior determination with respect to the mail sorter and information clerk occupations, the court further concludes that the Commissioner failed to show by substantial evidence that there are any jobs available to plaintiff in significant numbers in the national economy as it was her burden to do.[17]

## VI.    CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's motion (D.E. 18) for judgment on the pleadings be ALLOWED, the Commissioner's motion (D.E. 21) for judgment on the pleadings be DENIED, and this case be REMANDED to the Commissioner pursuant to

---

[17] While not raised by plaintiff in this appeal, the court notes that the ALJ did not discuss or even reference in his decision a 29 May 2013 award of disability-based Medicaid benefits by the North Carolina Department of Health and Human Services ("NCDHS"), which was contained in the record before him (Tr. 228) and discussed at the hearing (Tr. 32-33, 34). The ALJ's failure to address the Medicaid decision was one of the grounds for plaintiff's request for review by the Appeals Council. *See* Tr. 232-33 (Representative Brief in Supp. of Request for Review). In support of the request for review, plaintiff provided to the Appeals Council additional information on the Medicaid decision in the form of NCDHS's case analysis, which includes a description of the medical evidence considered. Tr. 235-37. While, as previously discussed, the Appeals Council admitted this additional evidence into the record (Tr. 5), it summarily denied the request for review without addressing the issue (Tr. 1-2).

The failure of the ALJ to address the effect of the Medicaid decision on his own disability determination constitutes an additional, independent ground for remand in this case. *See Alexander v. Astrue*, No. 5:09-CV-432-FL, 2010 WL 4668312, at *4 (E.D.N.C. 5 Nov. 2010) ("Decisions by other agencies as to the disability status of a Social Security applicant are considered so probative that the ALJ is required to examine them in determining an applicant's eligibility for benefits."); *see also Walton v. Astrue*, No. 7:09-CV-I12-D, 2010 WL 2772498, at *1 (E.D.N.C. 9 July 2010) (remanding where the ALJ made no mention of the Medicaid decision); *Watson v. Astrue*, No. 5:08-CV-553-FL, 2009 WL 2423967, at *3 (E.D.N.C. 6 Aug. 2009) (same). Accordingly, on remand, the Commissioner should give appropriate consideration to the Medicaid decision and sufficiently articulate the basis for the weight assigned to it.

sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Recommendation.

In making this ruling, the court expresses no opinion on the weight that should be accorded any piece of evidence. That is a matter for the Commissioner to decide.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until 15 February 2016 to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).**

Any response to objections shall be filed within 14 days after the filing of the objections.

This 1st day of February 2016.

_____
James E. Gates
United States Magistrate Judge